***********
Upon review of the competent evidence of record, with reference to the errors assigned, and finding no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms in part and reverses in part the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award. *Page 2 
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in their Pre-trial Agreement and at the hearing as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act, and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter of these proceedings.
2. An employment relationship existed between the parties on October 30, 2001.
3. Defendant-Carrier provided workers' compensation insurance coverage for Plaintiff's workers' compensation claim at all times relevant to these proceedings.
4. Defendants accepted the compensability of Plaintiff's October 30, 2001 work injury via a Form 60 dated March 6, 2003, and described Plaintiff's injuries as involving the "knees and right shoulder."
5. On October 17, 2003, Defendants filed another Form 60 admitting the compensability of Plaintiff's October 30, 2001 work injury only with respect to her "right shoulder," and stating that Plaintiff's disability began on February 25, 2003, with compensation beginning on June 1, 2003.
6. On March 12, 2008, Defendants filed a Form 61 denying the compensability of Plaintiff's October 30, 2001 work injury with respect to her bilateral knee condition.
7. Plaintiff continued to work for Defendant-Employer from October 30, 2001 through November 25, 2003.
8. Plaintiff's average weekly wage was $491.25 at all times relevant to these proceedings, yielding a compensation rate of $327.52. *Page 3 
9. Defendants did not pay any disability compensation to Plaintiff at all times relevant to these proceedings.
10. Plaintiff does not currently work for Defendant-Employer.
11. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits:
 a. Stipulated Exhibit One (1) — Pre-trial Agreement and North Carolina Industrial Commission forms and filings;
 b. Stipulated Exhibit Two (2) — Plaintiff's medical records;
 c. Stipulated Exhibit Three (3) — Curriculum Vitae and report of Dr. Richard A. Shirley.
 *********** ISSUES
The issues to be determined are:
1. Whether Plaintiff's bilateral knee surgeries are/were necessary for her bilateral knee complaints?
2. Whether Plaintiff's knee conditions requiring bilateral knee surgery performed by Dr. Jerry Lynn Barron are causally related to her October 30, 2001 work injury?
3. Whether and what periods of time was Plaintiff disabled from employment due to her October 30, 2001 work injury?
4. Whether Plaintiff is entitled to any further workers' compensation benefits for her October 30, 2001 work injury? *Page 4 
5. Whether Plaintiff's voluntary resignation from Defendant-Employer constituted a refusal to accept suitable employment, as defined by the North Carolina Workers' Compensation Act?
 ***********
Based upon the competent and credible evidence of record, as well as any reasonable inferences that may be drawn therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 69 years old, with a date of birth of October 20, 1940. Plaintiff has a high school diploma, and worked full-time for over 39 years as an orthodontist assistant. In addition to Plaintiff's full-time position as an orthodontist assistant, she also worked for Defendant-Employer part-time as a sales clerk for either 17 or 18 years.
2. On October 30, 2001, Plaintiff was working for Defendant-Employer when she fell onto her right side and knees as she was stepping off a loading ramp, thereby sustaining injuries to her right shoulder, right wrist, and both knees. The next day, Plaintiff presented to Dr. Larry Barnes at Pro Med in Charlotte, North Carolina and reported injuries to her right wrist, right shoulder, and both knees. Dr. Barnes diagnosed Plaintiff with finger and shoulder sprains, a lumbar strain, and knee, thigh, upper arm, and trunk contusions. Dr. Barnes noted that Plaintiff was already taking Lodine for her arthritis, and so he prescribed Flexeril in addition for pain and swelling, and gave her work restrictions of no sustained standing or walking, no overhead work with the right arm, and no use of the right hand.
3. Plaintiff continued to seek treatment at Pro Med throughout November and December 2001, and during this time period, received a referral for physical therapy. Plaintiff continued to complain of pain in her right shoulder and knees, although the pain improved. On *Page 5 
January 2, 2002, Plaintiff underwent magnetic resonance imaging (MRI) of both of her knees, which revealed bilateral meniscal tears.
4. On January 22, 2002, Plaintiff presented to Dr. Paul Pressly Gilbert, an orthopaedist, at which time she complained of pain in her right shoulder, the base of her neck, and both knees. Dr. Gilbert diagnosed Plaintiff with a fractured right scapula, as well as bilateral asymptomatic medial meniscal tears, and referred her to physical therapy. Dr. Gilbert opined that Plaintiff could return to work with a five (5) pound lifting restriction for her right arm.
5. On March 15, 2002, Plaintiff returned to Dr. Gilbert, at which time she complained of continued pain in her knees and right shoulder. Dr. Gilbert noted that Plaintiff had a healed right scapular fracture and unexplained bilateral knee pain. Dr. Gilbert further noted that he could not correlate Plaintiff's bilateral knee pain with the findings on the January 2, 2002 MRI's of her knees or his physical examination of her, in that her symptoms were in a different part of her knees than would typically be caused by medial meniscal tears. Thus, Dr. Gilbert opined that there was no indication to him that Plaintiff's October 30, 2001 work injury either caused or aggravated her bilateral medial meniscal tears.
6. On April 26, 2002, Plaintiff returned to Dr. Gilbert, at which time she reported that her bilateral knee pain improved, but that her right shoulder pain continued. Plaintiff underwent an MRI of the right shoulder on May 15, 2002. On May 31, 2002, Dr. Gilbert noted that Plaintiff had impingement in her right shoulder, but not a scapular fracture, as well as bilateral knee contusions. Further, Dr. Gilbert determined that Plaintiff was at maximum medical improvement and assigned a five (5) percent permanent partial disability rating to her right arm, along with a two (2) percent permanent partial disability rating to each of her legs. *Page 6 
7. At his deposition, Dr. Gilbert opined that although Plaintiff's MRI's revealed bilateral medial meniscal tears, he did not think that her bilateral knee pain was the result of the bilateral medial meniscal tears. However, Dr. Gilbert agreed that Plaintiff's October 30, 2001 work injury could have either caused or aggravated the bilateral medial meniscal tears if they were pre-existing, causing them to worsen over time. Further, Dr. Gilbert was of the opinion that Plaintiff's October 30, 2001 work injury caused her persistent bilateral knee pain.
8. On September 12, 2002, Plaintiff presented to Dr. Glenn Bradford Perry, an orthopaedist, for another opinion regarding her right shoulder. Dr. Perry diagnosed Plaintiff with right shoulder impingement and began a course of conservative treatment. Plaintiff's right shoulder pain did not improve, and so on January 28, 2003, she underwent another MRI of the right shoulder, which revealed persistent impingement.
9. On February 25, 2003, Plaintiff underwent an arthroscopic right sub-acromial decompression surgery performed by Dr. Perry. On April 2, 2003, Plaintiff returned to Dr. Perry, at which time she complained of parethesias of the right hand up to her shoulder. Dr. Perry noted that Plaintiff had a positive Tinel's sign over both the right carpal and cubital tunnels that produced parethesias in all fingers. Dr. Perry released Plaintiff to return to work with restrictions including no lifting more than two (2) to three (3) pounds, and no overhead work with the right arm. On May 15, 2003, Plaintiff returned to Dr. Perry, at which time she stated that her parethesias of the right upper extremity was decreasing. Dr. Perry noted that Plaintiff could return to work, but should avoid excessive heavy lifting. On June 3, 2003, Plaintiff underwent nerve conduction studies of the right upper extremity, which revealed normal findings. On July 14, 2003, Plaintiff returned to Dr. Perry, at which time he released her to return to work without restrictions in one (1) month. Dr. Perry noted that her current work *Page 7 
restrictions included no overhead work with her right upper extremity and no lifting over 10 pounds with her right upper extremity. On October 16, 2003, Dr. Perry released Plaintiff to return to work with no restrictions, and assigned a five (5) percent permanent partial disability rating to her right arm.
10. Beginning in April 2003, Plaintiff returned to work for Defendant-Employer on restricted duty with respect to her right upper extremity. Due to Plaintiff's various work restrictions issued by Dr. Perry, as well as her difficulty in walking the sales floor and making general sales, she was unable to perform her job duties as well as she had prior to her October 30, 2001 work injury. As a result, sometime in November 2003, Defendant-Employer reprimanded Plaintiff for failure to meet her sales quotas. On November 25, 2003, Plaintiff resigned her employment with Defendant-Employer due to her belief that she would ultimately be terminated for her failure to meet her sales quotas. However, there is no evidence of record indicating that Defendant-Employer actually planned to terminate Plaintiff for her failure to meet her sales quotas. Thus, the Full Commission finds, based upon the greater weight of the evidence, that on November 25, 2003, Plaintiff voluntarily resigned her employment with Defendant-Employer, and that this voluntary resignation constituted a refusal of suitable employment with Defendant-Employer.
11. Plaintiff continued to work at her full-time employment as an orthodontist assistant for Dr. Fay H. Culbreth until December 28, 2004, when he terminated her. Dr. Culbreth testified that Plaintiff was a good and conscientious employee for over 39 years. However, Dr. Culbreth was of the opinion that since Plaintiff's October 30, 2001 work injury, she was unable to perform her job duties as effectively. Plaintiff corroborated Dr. Culbreth's testimony by stating that after her October 30, 2001 work injury, she could no longer use her right hand to *Page 8 
remove braces or grip her orthodontic instruments, and she could no longer stand on her feet all day.
12. From May 31, 2002 through April 20, 2005, Plaintiff did not seek any treatment for her bilateral knee pain. On March 22, 2004, Plaintiff received a referral from Dr. Perry for pain management due to her continued complaints of parethesias of the right hand and right shoulder pain. On April 20, 2005, Plaintiff presented to Mr. Scott Brandon Webster, Dr. Perry's physician's assistant, with complaints of pain in her right shoulder and both knees. Mr. Webster noted that pain management was unsuccessful in relieving Plaintiff's complaints of parethesias of the right hand and right shoulder pain, and diagnosed her with possible early bilateral medial compartment degenerative changes in her knees.
13. On March 15, 2006, Plaintiff presented to Dr. Richard Charles Avioli, an orthopaedist, for an independent medical examination regarding her continued complaints of pain in her right hand, shoulder, and both knees. Dr. Avioli noted that Plaintiff's previous MRI's of her knees were suspicious for possible bilateral displaced flap tears, and questioned why no one ordered repeat MRI's of her knees in order to determine if there was a progression in severity from the original findings. Thus, Dr. Avioli recommended that Plaintiff undergo follow-up MRI's of her knees, and concluded that it was unclear to him how her October 30, 2001 work injury either caused, aggravated, or contributed to her bilateral knee pain. Dr. Avioli opined that Plaintiff's right hand pain and weakness were suggestive of carpal tunnel syndrome; however, he was unsure whether Plaintiff's October 30, 2001 work injury either caused, aggravated, or contributed to her possible carpal tunnel syndrome.
14. On February 15, 2007, Plaintiff presented to Dr. Frank Joseph Rowan, an orthopaedist, for an independent medical examination regarding her continued complaints of *Page 9 
pain in both knees. Dr. Rowan was of the opinion that Plaintiff's October 30, 2001 work injury did not cause the bilateral knee pain that she had beginning in April 2005. Rather, Dr. Rowan opined that Plaintiff's bilateral knee pain beginning in April 2005 was due to degenerative arthritis and unrelated to her October 30, 2001 work injury.
15. On May 29, 2007, Plaintiff presented to Dr. Jerry Lynn Barron, an orthopaedist, for evaluation of her continued complaints of pain in both knees. Dr. Barron's physical examination of Plaintiff revealed bilateral knee pain and crepitus, which were consistent with patello-femoral chondromalacia, and positive bilateral McMurray's and drop-back tests, which were consistent with bilateral torn menisci. As a result, Dr. Barron recommended bilateral knee arthroscopic surgery with meniscectomy and debridement; however, Defendants would not approve these procedures.
16. On June 25, 2007, Plaintiff presented to Dr. William Alan Ward, an orthopaedist, at which time she complained of numbness in her right hand. Dr. Ward diagnosed Plaintiff with median compressive neuropathy of the right wrist, probably related to her October 30, 2001 work injury, and exacerbated by post-operative swelling from her February 25, 2003 arthroscopic right sub-acromial decompression surgery. On August 2, 2007, Plaintiff returned to Dr. Ward, at which time he diagnosed her with right-sided post-traumatic carpal tunnel syndrome directly related to her post-operative recovery following her February 25, 2003 arthroscopic right sub-acromial decompression surgery.
17. On October 3, 2007, Plaintiff presented to Dr. David Norris DuPuy, an orthopaedist, for an independent medical examination regarding her continued complaints of pain in both knees. Dr. DuPuy's physical examination of Plaintiff revealed bilateral knee pain, crepitus, and arthritis. At his deposition, Dr. DuPuy opined that Plaintiff's October 30, 2001 *Page 10 
work injury neither caused, nor aggravated, nor contributed to her bilateral knee arthritis or pre-existing medial meniscal tears. Dr. DuPuy based his opinion partly on his belief that within months of Plaintiff's October 30, 2001 work injury, her knees achieved their pre-injury state. Dr. DuPuy did not recommend that Plaintiff undergo bilateral knee arthroscopic surgery. However, Dr. DuPuy agreed that a surgeon's ability to visualize a patient's knee makes arthroscopic surgery "a lot more accurate" than a review of MRI's of the knee in assessing the nature and cause of medial meniscal tears. Further, Dr. DuPuy agreed that the most inaccurate MRI is of the medial meniscus.
18. On April 1, 2008, Plaintiff underwent right carpal tunnel release surgery performed by Dr. Ward. At his deposition, Dr. Ward opined that Plaintiff was at maximum medical improvement with respect to her right wrist as of September 15, 2008, and assigned her a five (5) percent permanent partial disability rating to her right hand. The Full Commission gives great weight to the opinion testimony of Dr. Ward.
19. On November 24, 2008, Plaintiff returned to Dr. Barron, at which time he noted that she continued to have bilateral knee pain, crepitus, and positive McMurray's tests. Dr. Barron also noted that Plaintiff was now limping. On January 19, 2009, Plaintiff underwent left knee arthroscopic surgery with meniscectomy and debridement. Dr. Barron's surgical findings included an intra-substance tear of the discoid lateral meniscus, and softening of the patellar cartilage and of the outside part of the knee.
20. At his deposition, Dr. Barron, who specializes in knee and shoulder arthroscopic surgeries, opined that both Plaintiff's left and right knees probably have the same diagnosis of chondromalacia, and that the right knee likely had a medial meniscal tear, as well, based upon a review of her knee MRI's and his physical examinations of her. According to Dr. Barron, if *Page 11 
Plaintiff's January 19, 2009 left knee arthroscopic surgery with meniscectomy and debridement provides her with adequate pain relief, then he will perform the same surgery on her right knee. Further, Dr. Barron opined that Plaintiff is not at maximum medical improvement with respect to either of her knees.
21. With respect to the issue of whether Plaintiff's October 30, 2001 work injury was a significant causal factor in the development of her bilateral medial meniscal tears necessitating her January 19, 2009 left knee arthroscopic surgery with meniscectomy and debridement, Dr. Barron is of the opinion, and the Full Commission so finds, that Plaintiff "had a traumatic event that caused or at least aggravated her knee, and it could have aggravated the tear." Dr. Barron further opined that ". . . yes, I mean, I think the event played a role." According to Dr. Barron, most medial meniscal tears are caused by trauma, and Plaintiff's surgical findings were consistent with this, in that Dr. Barron personally observed a traumatic tear to her left medial meniscus. Dr. Barron explained that as the surgeon who actually performed Plaintiff's January 19, 2009 left knee arthroscopic surgery with meniscectomy and debridement, his assessment of the nature and cause of her left knee injury is 100 percent accurate, since he can actually visualize the injury, whereas MRI's of the knee are less accurate, providing up to 10 percent false positive or negative readings.
22. Defendants retained Dr. Richard A. Shirley, an orthopaedist from Texas who no longer performs surgeries, in order to perform a medical records review concerning Plaintiff's October 30, 2001 work injury; however, Dr. Shirley never personally examined Plaintiff. At his deposition, Dr. Shirley opined that Plaintiff's bilateral knee pain following her October 30, 2001 work injury did not correlate with her MRI's of the knees or the reports of her physical examinations by Dr. Gilbert. Further, Dr. Shirley was of the opinion that Plaintiff's MRI's of the *Page 12 
knees did not indicate that her October 30, 2001 work injury necessitated her January 19, 2009 left knee arthroscopic surgery with meniscectomy and debridement. However, Dr. Shirley agreed that Dr. Barron was in a better position to diagnose and offer opinions on causation concerning Plaintiff's bilateral knee pain. In addition, although Dr. Shirley felt that Plaintiff had pre-existing arthritis in her knees, he agreed that her October 30, 2001 work injury could have accelerated or exacerbated her arthritis, which could have necessitated her January 19, 2009 left knee arthroscopic surgery with meniscectomy and debridement.
23. The Full Commission gives greater weight to the opinion testimony of Dr. Barron than to any contrary opinions of Dr. Gilbert, Dr. Perry, Dr. Avioli, Dr. Rowan, or Dr. Shirley with respect to Plaintiff's complaints of bilateral knee pain. Dr. Barron performed Plaintiff's January 19, 2009 left knee arthroscopic surgery with meniscectomy and debridement, which allowed him to actually visualize her injury in order to determine its cause. In addition, Dr. Barron specializes in knee and shoulder arthroscopic surgeries, whereas none of these other physicians have such a specialized practice.
24. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff sustained a compensable injury by accident arising out of and in the course and scope of her employment with Defendant-Employer on October 30, 2001 to her right wrist/hand, shoulder, and both knees.
25. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's October 30, 2001 work injury necessitated her February 25, 2003 arthroscopic right sub-acromial decompression surgery, and that her right-sided post-traumatic carpal tunnel syndrome was directly related to her post-operative recovery following her arthroscopic right *Page 13 
sub-acromial decompression surgery. Thus, Plaintiff's October 30, 2001 work injury necessitated her need for the April 1, 2008 right carpal tunnel release surgery.
26. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's October 30, 2001 work injury either caused or aggravated her bilateral medial meniscal tears and bilateral knee problems, and necessitated her January 19, 2009 left knee arthroscopic surgery with meniscectomy and debridement. The Full Commission further finds that Plaintiff would likely benefit from right knee arthroscopic surgery with meniscectomy and debridement.
27. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff reached maximum medical improvement with respect to her right shoulder injury on October 16, 2003, and has a five (5) percent permanent partial disability rating to her right arm.
28. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff reached maximum medical improvement with respect to her right wrist on September 15, 2008, and has a five (5) percent permanent partial disability rating to her right hand.
29. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff is not at maximum medical improvement with respect to her bilateral knee problems.
30. The Full Commission finds, based upon the greater weight of the evidence, that as a result of Plaintiff's October 30, 2001 work injury, she was unable to earn any wages in any other employment for those periods of time in which she missed work due to treatment of her work injuries prior to her refusal of suitable employment with Defendant-Employer on November 25, 2003, and that she was incapable of working for a period of six (6) weeks after her carpal tunnel surgery. Plaintiff was also incapable of working for a period of time following her January 19, 2009 left knee surgery; however, the evidence of record is insufficient to establish *Page 14 
the period of disability since the surgery took place after the hearing and Plaintiff had not reached maximum medical improvement at the time of Dr. Barron's deposition.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident arising out of and in the course and scope of her employment with Defendant-Employer on October 30, 2001 to her right wrist/hand, shoulder, and both knees. N.C. Gen. Stat. § 97-2(6) (2008).
2. Plaintiff's October 30, 2001 work injury necessitated her February 25, 2003 arthroscopic right sub-acromial decompression surgery, and her right-sided post-traumatic carpal tunnel syndrome is directly related to her post-operative recovery following her arthroscopic right sub-acromial decompression surgery. Thus, Plaintiff's October 30, 2001 work injury necessitated her April 1, 2008 right carpal tunnel release surgery. N.C. Gen. Stat. § 97-25 (2008).
3. Defendants are bound by the Form 60 filed on March 6, 2003 admitting the compensability of Plaintiff's October 30, 2001 work injury with respect to her "knees and right shoulder." Perez v. American Airlines,174 N.C. App. 128, 620 S.E.2d 288 (2005). Because Defendants admitted the compensability of Plaintiff's bilateral knee injuries via the March 6, 2003 Form 60, Plaintiff is entitled to a rebuttable presumption that her current medical treatment for her bilateral knee pain, including her January 19, 2009 left knee arthroscopic surgery with meniscectomy and debridement, is directly related to her October 30, 2001 work injury. Id. Thus, the burden is on Defendants to rebut the presumption that Plaintiff's current bilateral knee pain and January 19, 2009 left knee arthroscopic surgery with meniscectomy and debridement *Page 15 
are causally related to her October 30, 2001 work injury. Defendants' March 12, 2008 Form 61 denying the compensability of Plaintiff's work injury with respect to her bilateral knee condition has no binding effect. Id.
4. In the case at bar, Defendants failed to rebut the presumption that Plaintiff's current bilateral knee pain and January 19, 2009 left knee arthroscopic surgery with meniscectomy and debridement are causally related to her October 30, 2001 work injury. Dr. Jerry Lynn Barron opined, and the Full Commission has found as fact, that Plaintiff's October 30, 2001 work injury either caused or aggravated her bilateral knee pain, and "could have" aggravated her bilateral medial meniscal tears. Although Dr. Barron qualified his opinion by stating that Plaintiff's October 30, 2001 work injury "could have" aggravated her bilateral medial meniscal tears, he went on to agree that the work injury "played a role" in the development of the left medial meniscal tear that he observed during the January 19, 2009 left knee arthroscopic surgery with meniscectomy and debridement. Such testimony satisfies the requirements of Holley v. ACTS, Inc., which sets forth the minimum standards required for the admission of medical causation testimony in workers' compensation cases, including the requirement that the testimony be "more likely than not," and Young v. HickoryBusiness Furniture, which requires that an expert opinion be based upon more than mere speculation and conjecture. Further, the operative report from the January 19, 2009 left knee arthroscopic surgery with meniscectomy and debridement independently documents that Plaintiff suffered a left medial meniscal tear, and Dr. Barron unequivocally opined that this medial meniscal tear resulted from trauma. Dr. Barron was also of the opinion that Plaintiff's right knee likely had a medial meniscal tear, as well, based upon a review of her knee MRI's and his physical examinations of her. Additionally, Plaintiff testified that prior to her October 30, 2001 work injury, she had no knee pain, but *Page 16 
immediately after the work injury, she had persistent bilateral knee pain and no other episode of a traumatic event to her knees following the work injury that would account for the left medial meniscal tear. Holley v. ACTS, Inc.,357 N.C. 228, 581 S.E.2d 750 (2003); Young v. Hickory BusinessFurniture, 353 N.C. 227, 538 S.E.2d 912 (2000).
5. If an expert is unable to state with certainty that there is a nexus between an event and an injury, their testimony is at least some evidence of causation if there is additional evidence which establishes that the expert's testimony is more than conjecture. Booker-Douglas v. JS Truck Serv., Inc.,178 N.C. App. 174, 630 S.E.2d 726 (2006); Adams v. MetalsUSA, 168 N.C. App. 469, 608 S.E.2d 357, aff'd per curiam,360 N.C. 54, 619 S.E.2d 495 (2005). Thus, "could" or "might" causation testimony can be probative and competent evidence to prove causation, provided that there is additional evidence which is capable of taking the testimony out of the realm of mere speculation or conjecture. Young, 353 N.C. 227, 538 S.E.2d 912 (2000);Workman v. Rutherford Elec. Membership Corp.,170 N.C. App. 481, 613 S.E.2d 243 (2005).
6. Plaintiff's October 30, 2001 work injury either caused or aggravated her bilateral medial meniscal tears, and necessitated her January 19, 2009 left knee arthroscopic surgery with meniscectomy and debridement. N.C. Gen. Stat. § 97-25 (2008).
7. Plaintiff reached maximum medical improvement with respect to her right shoulder injury on October 16, 2003, and has a five (5) percent permanent partial disability rating to her right arm. N.C. Gen. Stat. § 97-31 (2008).
8. Plaintiff reached maximum medical improvement with respect to her right wrist on September 15, 2008, and has a five (5) percent permanent partial disability rating to her right hand. N.C. Gen. Stat. § 97-31 (2008). *Page 17 
9. Plaintiff is not at maximum medical improvement with respect to her bilateral knee pain.
10. As a result of Plaintiff's October 30, 2001 work injury, Plaintiff is entitled to temporary total disability compensation at the rate of $327.52 per week for those periods of time in which she missed work due to treatment of her work injuries prior to her refusal of suitable employment with Defendant-Employer on November 25, 2003. Plaintiff is also entitled to temporary total disability compensation for a period of six (6) weeks after her carpal tunnel surgery. Since the evidence of record is insufficient to establish Plaintiff's period of disability after her left knee surgery on her January 19, 2009, Plaintiff's period of disability after January 19, 2009 must be reserved for subsequent determination. N.C. Gen. Stat. § 97-29 (2008); Russell v. LowesProd. Distribution, 108 N.C. App. 762 (1993).
11. As a result of Plaintiff's October 30, 2001 work injury, Plaintiff is entitled to have Defendants pay for all medical treatment reasonably related to her work injury, including, but not limited to any and all treatment rendered by Dr. Barron. Plaintiff would likely benefit from right knee arthroscopic surgery with meniscectomy and debridement in the near future. N.C. Gen. Stat. §§ 97-25; 97-25.1 (2008).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, Defendants shall pay temporary total disability compensation to Plaintiff at the rate of $327.52 per week for those periods of time in which she missed work due to treatment of her work injuries prior to her *Page 18 
refusal of suitable employment with Defendant-Employer on November 25, 2003 and for the six (6) weeks she was disabled from working after her carpal tunnel surgery. Defendants are allowed a credit for compensation already paid.
2. Subject to a reasonable attorney's fee herein approved, Defendants shall pay permanent partial disability compensation to Plaintiff at the rate of $327.52 per week for the 12 weeks for the five (5) percent permanent partial disability rating to her right arm, and the 10 weeks for the five (5) percent permanent partial disability rating to her right hand, for a total of 22 weeks.
3. Defendants shall pay all medical expenses incurred or to be incurred as a result of Plaintiff's October 30, 2001 work injury, including, but not limited to any and all treatment rendered by Dr. Barron, for so long as such evaluations, examinations, and treatments may reasonably be required to effect a cure, to give relief, and/or to lessen her period of disability, in accordance with the provisions of the North Carolina Workers' Compensation Act.
4. A reasonable attorney's fee of 25 percent is hereby approved for Plaintiff's counsel from the sums due Plaintiff under paragraph one (1) and paragraph two (2), above. Defendants shall deduct and pay directly to Plaintiff's counsel 25 percent of the accrued compensation owed to Plaintiff and every fourth (4th) check thereafter.
5. A determination on Plaintiff's disability after January 19, 2009 is reserved for subsequent determination. Either party may request a hearing on this issue.
6. Defendants shall pay the costs of these proceedings.
This the ___ day of January 2010.
S/___________________ *Page 19 
BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ STACI T. MEYER COMMISSIONER
 S/_____________ CHRISTOPHER SCOTT COMMISSIONER *Page 1